NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 18a0431n.06

No. 17-2016

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| VALARIE DAVIS, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| FIAT CHRYSLER AUTOMOBILES U.S., LLC, | ) | DISTRICT OF MICHIGAN |
| | ) | |
| Defendant-Appellee. | ) | |
| | ) | |

FILED
Aug 22, 2018
DEBORAH S. HUNT, Clerk

**BEFORE: GIBBONS, BUSH, and LARSEN, Circuit Judges.**

**JULIA SMITH GIBBONS, Circuit Judge.** In 2015, Valarie Davis brought this hostile work environment claim against her employer, Fiat Chrysler Automobile US LLC ("FCA"), alleging violations of Title VII of the Civil Rights Act of 1964 and of Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"). Davis claimed that she had endured discriminatory conduct from co-workers, mainly in the form of displays of and references to monkeys around her office. The district court granted summary judgment for FCA, concluding that Davis was judicially estopped from asserting a hostile work environment claim because she had not listed the claim as an asset in an earlier bankruptcy proceeding. The district court further concluded that Davis could not succeed on her hostile work environment claim as a matter of law because she had not shown a genuine issue of material fact that any racial harassment was sufficiently severe or pervasive. We agree that judicial estoppel bars Davis's hostile work environment claim here and therefore affirm the district court.

I.

Valerie Davis, an African-American woman, is a clay modeler who has worked for FCA sculpting car models since 2000.[1] In 2004, Davis submitted a letter to her EEOC representative at FCA complaining of actions she considered to be racial discrimination by her co-workers in her then-workspace, Studio 1. Her complaints included that her supervisor made remarks about African-American employees' "kinky hair," that co-workers referred to her as "my little brown friend," and that a co-worker would use a "'monkey calling' device every time [she] would walk by him." DE 13-3, 2004 Letter, Page ID 175. She also claims that she was called "chicky monkey" by her Studio 1 co-workers. DE 1, Compl., Page ID 3. She informed her co-workers that she did not like being referred to as a monkey and complained about these references to her supervisors. (***Id.* at 2–3.**) Following an investigation by FCA into this complaint, Davis did not experience any more racially offensive incidents during the next eight years she worked in Studio 1.

On April 30, 2008, Davis filed a petition for bankruptcy under Chapter 13 of the United States Bankruptcy Code and was subject to a five-year bankruptcy plan. The United States Bankruptcy Court for the Eastern District of Michigan issued an order discharging Davis after completion of her Chapter 13 plan on December 10, 2013. In 2012, while still proceeding in bankruptcy, Davis was transferred from Studio 1 to Studio 7/8 at FCA—her current workspace. Incidents at Studio 7/8 form the basis for Davis's complaint in this case.

Davis's alleges that "[a]s recently as 2013, [Davis's] co-workers began to place monkeys in different forms around her cubicle and throughout locations known as studios 7 and 8." DE 1, Compl., Page ID 3. On March 25, 2013, Davis filed a complaint with FCA's diversity office describing offensive behavior by her coworkers across the prior two years, including "her co-

---

[1] We recite the facts in the light most favorable to Davis. *See Groening v. Glen Lake Cmty. Sch.*, 884 F.3d 626, 630 (6th Cir. 2018).

workers displaying monkeys." DE 1, Compl., Page ID 3. In her complaint letter to the diversity office, she wrote that there was "a monkey hanging from a cubical with Christmas lights wrapped around it's [sic] neck" in her studio. DE 13-5, 2013 Letter, Page ID 220. In response to this letter, two FCA representatives conducted a walk-through of Studio 7/8 on April 4, 2013. The FCA representatives concluded that the referenced monkey "was a stuffed animal with long arms that could velcro together" and that it "hung from the edge of a cubicle" and that "the Christmas lights did not wrap around its neck." DE 13-6, FCA Memo, Page ID 222. The representatives also noted that they observed a second monkey, an "Ape or a Gorilla," sitting on another designer's overhead cabinet. They concluded that "[n]either monkey[] appeared to be racially offensive in any way." *Id.*

Following this inspection, Davis e-mailed one of the representatives to report that both monkeys were still on display and that she took the matter "very seriously," as "monkeys have been used to depict [African Americans] historically in derogatory terms." DE 14-27, Davis E-mail, Page ID 952. But, Davis alleges, these monkey displays did not end, and there were "at least 8 to 10 monkeys" on display in her work area between 2013 and January 2015. DE 1, Compl., Page ID 3.

Davis filed a discrimination charge with the EEOC on March 10, 2015. She received notice of the EEOC's decision to close its file on her charge and was issued a right to sue letter on August 20, 2015. Davis then filed this hostile work environment lawsuit on October 26, 2015, alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and of Michigan's Elliot-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2101 *et seq.*,.

The district court granted summary judgment for FCA. It concluded, after holding oral argument, that because Davis had not listed her potential hostile work environment claim against

FCA as an asset in her bankruptcy proceeding, she was judicially estopped from bringing her claims here. The district court further held that Davis's Title VII and ELCRA hostile work environment claims failed on the merits, as she had not shown a genuine issue of material fact regarding the severity and pervasiveness of any discrimination; it therefore concluded that FCA was entitled to summary judgment on those grounds as well. Davis then filed this appeal.

II.

We review a district court's grant of summary judgment *de novo*. *Kalich v. AT&T Mobility, LLC*, 679 F.3d 464, 469 (6th Cir. 2012). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the court must "draw all reasonable inferences in favor of the nonmoving party." *Int'l Union v. Cummins, Inc.*, 434 F.3d 478, 483 (6th Cir. 2006) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). But a nonmoving plaintiff must come forward with more than "a scintilla of evidence" in support of its position such that "the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). We then ask "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. Additionally, "[t]his court reviews de novo the district court's application of judicial estoppel."[2] *White v. Wyndham Vacation Ownership, Inc.*, 617 F.3d 472, 476 (6th Cir. 2010).

---

[2] We addressed the seeming incongruity of applying *de novo* review to the inherently discretionary decision of a court to apply judicial estoppel in *Lewis v. Weyerhaeuser Co.*, 141 F. App'x 420 (6th Cir. 2005), noting:

> [T]he Supreme Court [in *New Hampshire v. Maine*] has recently described judicial estoppel as "an equitable doctrine invoked by the court at its discretion." In the Sixth Circuit, "[g]enerally matters that are committed to the sound discretion of the district court are reviewed by the court of appeals for abuse of discretion." *Workman v. Frito-Lay, Inc.*, 165 F.3d 460, 465 (6th Cir. 1999). Indeed, a majority of federal courts that have addressed the issue apply the abuse of discretion standard to a district court's application of judicial estoppel. In light of *New Hampshire* and the extensive

III.

The district court held that Davis was judicially estopped from bringing this hostile work environment claim because she had enough information prior to the closing of her bankruptcy estate to suggest that she had a possible cause of action and therefore had to disclose her possible claims in the bankruptcy proceeding. Davis contends that estoppel was improper because at the time of her bankruptcy estate discharge, she had not yet been subjected to pervasive acts of discrimination at FCA and therefore did not have knowledge of facts giving rise to a hostile work environment claim. We agree with the district court that, viewing the evidence in the light most favorable to Davis, she knew enough information about a possible cause of action for discrimination against FCA by December 2013 to trigger her duty to disclose the claim to the bankruptcy court, making the application of judicial estoppel proper. *See White*, 617 F.3d at 478.

Judicial estoppel "is an equitable doctrine invoked by a court at its discretion." *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (quoting *Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir. 1990)). Its purpose is "to preserve 'the integrity of the courts by preventing a party from abusing the judicial process through cynical gamesmanship,'" *White*, 617 F.3d at 476 (quoting *Browning v. Levy*, 283 F.3d 761, 776 (6th Cir. 2002)), and it therefore "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument

---

contrary authority, we question the continued use of the *de novo* standard in the context of judicial estoppel.

*Id.* at 423–24 (third alteration in original) (some citations omitted). The court in *Lewis*, however, declined to resolve the issue because it found "the district court's ruling was proper under either standard." *Id.* at 424; *see also Kimberlin v. Dollar Gen. Corp.*, 520 F. App'x 312, 313 n.1 (6th Cir. 2013) (again declining to resolve this question). But our later cases have clarified that the *de novo* standard is proper for questions of judicial estoppel. *See Mirando v. U.S. Dep't of Treas.*, 766 F.3d 540, 545 n.1 (6th Cir. 2014) ("[B]ecause the Court [in *New Hampshire*] did not instruct us to review for abuse of discretion, we continue to apply de novo review absent a more definitive statement from the Court."); *see also Lorillard Tobacco Co. v. Chester, Willcox & Saxbe*, 546 F.3d 752, 757 (6th Cir. 2008) ("[T]he Supreme Court [in *New Hampshire*] did not instruct that an abuse of discretion standard is appropriate, and this Court has continued to adhere to the *de novo* standard after *New Hampshire*. Without a more definitive statement from the Supreme Court, this Court is bound by its own precedent and will therefore apply the *de novo* standard to the district court's order." (citations omitted)).

to prevail in another phase," *New Hampshire*, 532 U.S. at 749 (quoting *Pegram v. Herdrich*, 530 U.S. 211, 227, n.8 (2000)). In the bankruptcy context, judicial estoppel functions to bar "a party from asserting a position that is contrary to one the party has asserted under oath in a prior proceeding, where the prior court adopted the contrary position 'either as a preliminary matter or as part of a final disposition.'" *Eubanks v. CBSK Fin. Grp., Inc.*, 385 F.3d 894, 897 (6th Cir. 2004) (quoting *Teledyne Indus., Inc. v. NLRB*, 911 F.2d 1214, 1218 (6th Cir. 1990)).

Although "judicial estoppel has not been reduced to a hard-and-fast test," our precedent articulates certain "guiding factors" to consider in assessing whether judicial estoppel should function to bar a claim. *Haddad v. Randall S. Miller Assocs., PC*, 587 F. App'x 959, 965 (6th Cir. 2014); *see also New Hampshire*, 532 U.S. at 750 (observing that "[t]he circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation of principle" (alteration in original) (quoting *Allen v. Zurich Ins. Co.*, 667 F.2d 1162, 1166 (4th Cir. 1982))). The clearest application of these considerations in the employment discrimination and bankruptcy context in our circuit comes from *White v. Wyndham Vacation Ownership, Inc.*, which indicates that judicial estoppel will bar a claim when (1) a party "assumed a position that was contrary to the one that she asserted under oath in the bankruptcy proceedings," (2) "the bankruptcy court adopted the contrary position either as a preliminary matter or as part of a final disposition," and (3) the omission "did not result from mistake or inadvertence." 617 F.3d at 478; *see also Kimberlin v. Dollar Gen. Corp.*, 520 F. App'x 312, 314 (6th Cir. 2013) (applying these factors). The second question—whether the bankruptcy adopted the position—is not at issue in this case. The bankruptcy court confirmed Davis's bankruptcy plan without the potential claim listed as an asset, which is sufficient to satisfy the second consideration. *See White*, 617 F.3d at 479. Our analysis therefore focuses on the remaining two considerations.

1.

A debtor in a Chapter 13 proceeding has a duty to disclose any potential claim as an asset to the bankruptcy court in a schedule of assets and liabilities. *Lewis*, 141 F. App'x at 424; *see* 11 U.S.C. § 521. This disclosure obligation is ongoing, meaning a debtor has "an express, affirmative duty to disclose all assets, including contingent and unliquidated claims" that arise at any time during the bankruptcy proceeding. *White*, 617 F.3d at 479 n.5 (quoting *In re Coastal Plains, Inc.*, 179 F.3d 197, 207–08 (5th Cir. 1999)). "[T]he disclosure obligations of consumer debtors are at the very core of the bankruptcy process and meeting these obligations is part of the price debtors pay for receiving the bankruptcy discharge." *Lewis*, 141 F. App'x at 424 (alteration in original) (quoting *In re Colvin*, 288 B.R. 477, 481 (Bankr. E.D. Mich. 2003)). And therefore, as this court has recognized, applying judicial estoppel to bar known, potential claims a debtor fails to declare to the bankruptcy court "recognizes the importance of the bankruptcy debtor's affirmative and ongoing duty to disclose assets, including unliquidated litigation interests." *Kimberlin*, 520 F. App'x at 314.

When a debtor has failed to disclose a known potential claim in a bankruptcy proceeding, this court has held that the "omission was equivalent to a statement that there were no such claims." *Stephenson v. Malloy*, 700 F.3d 265, 274 (6th Cir. 2012); *see also Lewis*, 141 F. App'x at 425 ("[P]ursuing a cause of action that was not disclosed as an asset in a previous bankruptcy filing creates an inconsistency sufficient to support judicial estoppel."). Therefore, in such instances, a party will have "assumed a position that was contrary to the one that she asserted under oath in the bankruptcy proceedings," satisfying that prong of judicial estoppel. *White*, 617 F.3d at 478.

Here, Davis acknowledges that she did not list a potential hostile work environment claim against FCA in her schedule of assets and liabilities filed with the bankruptcy court, nor did she

7

ever represent to the bankruptcy court that she might have such a claim before her proceeding terminated in December 2013. But she contends that she did not take a contrary position because she did not know all the facts supporting her hostile work environment claim before her bankruptcy discharge in December 2013. She premises this argument on her contention that there was only one monkey in Studio 7/8 before December 2013—the Christmas-light monkey.[3] But her own assertions in this case belie this claim. Moreover, the test is not whether Davis knew *all* of the facts that *could possibly* support a claim, but instead whether she had sufficient information to know that she had a possible cause of action against FCA for discrimination before her bankruptcy was discharged. *See White*, 617 F.3d at 479; *Lewis*, 141 F. App'x at 421–22.

Reading the record in the light most favorable to Davis, she had knowledge of a potential discrimination claim against FCA prior to December 10, 2013. Her complaint alleges that "[a]s recently as 2013, [Davis's] co-workers began to place monkeys in different forms around her cubicle" and throughout Studio 7/8; that in March 2013 she "complained . . . to human resources regarding her co-workers displaying monkeys," including complaining about the Christmas-light monkey; and that in April 2013 she made another complaint "regarding two more monkeys." DE 1, Compl., Page ID 3. In her letter to FCA's diversity office in March 2013 she wrote that she had been dealing with "unprofessional, ignorant, sexist and even racist" behavior in her office across *the prior two years*." DE 13-5, 2013 Letter, Page ID 220 (emphasis added). And after FCA representatives indicated that they would not take action regarding the Christmas-light monkey, on April 8, 2013, Davis sent one of the representatives an e-mail stating that she took the matter "very seriously," as "monkeys have been used to depict [African Americans] historically in

---

[3] The district court focused in particular on this incident in its judicial estoppel analysis but also cited Davis's claim in her 2013 letter to FCA's diversity office that "racial discrimination [at FCA] resumed around 2012" and her knowledge of and complaints about the earlier racially offensive comments in Studio 1. DE 17, Order, Page ID 1035.

derogatory terms." DE 14-27, Davis E-mail, Page ID 952. Due to her earlier experience in Studio 1 with monkeys and racially offensive comments, Davis was sensitive to monkey displays and references and had let her co-workers and supervisors know as much. CA6 R. 23, Appellant Br., at 15. But Davis did not file an EEOC complaint of discrimination until March 2015—fifteen months after the close of her bankruptcy estate—even though she had enough information by December 2013 to know that she had a possible claim for racial discrimination against FCA.

On appeal, Davis argues that the district court should not have applied judicial estoppel because "[b]efore the discharge there was one monkey that appeared in March" and "[t]he first time [Davis] noticed the presence of other monkeys was *after* the [d]ischarge." CA6 R. 23, Appellant Br., at 26. She therefore claims that she did not know of a potential hostile work environment claim by December 10, 2013. But, as outlined, Davis's own claims in this case contradict this argument and show that she was aware of a potential claim while her bankruptcy was ongoing. Moreover, the record indicates that many of the additional incidents Davis cites as having happened after December 10, 2013, actually occurred before that date, while her bankruptcy was still pending.

For example, in her brief, Davis claims that her co-worker Michelle Menendez "brought a sock monkey to the workplace and hung it in her cubicle" 15 days after Davis's bankruptcy discharge. CA6 R. 23, Appellant Br., at 17. But in her deposition, Davis was questioned about a journal entry dated May 20, 2013, in which she had written "monkey not in 'site' [sic]. Michelle out," and Davis acknowledged that she must have been referring to Michelle's monkey.[4] DE 13-2, Davis Dep., Page ID 145–46. Similarly, Davis's brief claims that her co-worker Joseph Marcum gave her a clay mold with the word monkey on it after her bankruptcy closed. But in her

---

[4] The actual journal entries are not in the record; there is only Davis's deposition testimony in which she acknowledges them when questioned.

deposition, she acknowledged a journal entry stating "Joe gave me a monkey mold" under the date December 2, 2013. *Id.* at 146. Davis's brief also alleges that her co-worker Tom Cuadrio brought a blow-up monkey and another monkey to display on his laptop to FCA, though she claims it is "unclear" when these monkeys appeared. But the only evidence in the record about the date of the blow-up monkey's appearance indicates that it was in the office as early as October 1, 2013. Therefore, these additional incidents actually support the application of judicial estoppel here. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002) (noting that hostile work environment claims "involve[] repeated conduct").

In short, the record and Davis's own allegations show there was ample information prior to December 10, 2013, to trigger Davis's disclosure obligation to the bankruptcy court, meaning that by her failure to do so she "assumed a position that was contrary to the one that she asserted under oath in the bankruptcy proceedings." *White*, 617 F.3d at 478.

2.

These same considerations demonstrate that any omission by Davis was not the result of "mistake or inadvertence." *Id.*

In determining whether an omission was the result of mistake or inadvertence, we consider a litigant's "knowledge of the factual basis of the undisclosed claims," any "motive for concealment," and if "the evidence indicates an absence of bad faith"—with particular focus on any attempt "to advise the bankruptcy court of [an] omitted claim." *Id.*; *see Browning*, 283 F.3d at 776; *see also Eubanks*, 385 F.3d at 897–99. The final two prongs of this inquiry are not at issue here: there is no evidence that Davis made any disclosure about a potential claim to the bankruptcy court, *White*, 617 F.3d at 478, and if a claim existed, there would be a motive to conceal this asset,

*see Lewis*, 141 F. App'x at 426 ("It is always in a Chapter 13 petitioner's interest to minimize income and assets."); *see also White*, 617 F.3d at 479.

This leaves only Davis's "knowledge of the factual basis of the undisclosed claim." *White*, 617 F.3d at 478. This inquiry overlaps with our consideration of her assumption of a contrary position, *supra.* To summarize briefly, Davis had a demonstrated sensitivity regarding monkeys based on her experience at Studio 1, had made a written complaint to FCA's diversity office about monkey displays in Studio 7/8, and felt concerned enough about these and other incidents to document them as journal entries. After her written complaint to FCA but before her bankruptcy estate closed on December 10, 2013, there were additional monkeys displayed in Studio 7/8 that Davis now forwards as the basis of her hostile work environment claim. Still, Davis made no further written complaints to FCA during this time period and waited until fifteen months after her bankruptcy estate closed to file an EEOC complaint and initiate this lawsuit.

These actions show Davis had knowledge of the factual basis of a potential hostile work environment claim before December 10, 2013, and therefore any omission to the bankruptcy court was not the result of mistake or inadvertence.

## IV.

Because Davis assumed a position that was contrary to the one that she asserted under oath in the bankruptcy proceedings, the bankruptcy court adopted this contrary position, and her omission did not result from mistake or inadvertence, the district court's decision to apply judicial estoppel was appropriate here. *See White*, 617 F.3d at 478. We therefore do not consider the district court's alternative holding that that Davis has not shown a genuine issue of material fact regarding her ability to succeed in her Title VII and ELCRA claims and affirm the district court's grant of summary judgment for FCA based on judicial estoppel.